UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
RONALD WILLIAMS,

                Plaintiff,

        - against -

OFFICER JOHN TOTO, and ATTORNEY
GENERAL L. JAMES,

                Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CV-4593 (PKC) (VMS)

PAMELA K. CHEN, United States District Judge:

On February 25, 2021, Plaintiff Ronald Williams, who is incarcerated at Rikers Island and is proceeding *pro se*, filed a Second Amended Complaint ("SAC") (Dkts. 11, 11-1) in response to the Court's December 16, 2020 Memorandum and Order ("M&O"), which granted Plaintiff leave to file an amended pleading to cure certain deficiencies in the Amended Complaint (Dkt. 5) with respect to claims under 42 U.S.C. § 1983 ("Section 1983") and 28 U.S.C. § 2241 ("Section 2241"), as well as to claims against Defendants New York State Attorney General Letitia James and New York City Police Department ("NYPD") Officer John Toto (*see* M&O, Dkt. 9, at 26).  Plaintiff subsequently supplemented the SAC with additional materials (*see* Dkts. 13, 13-1, 13-2, 13-3, 13-4), which the Court deemed incorporated into the SAC (3/11/2021 Docket Order).  For the reasons set forth below, Plaintiff's Section 2241 habeas claim is dismissed and his Section 1983 claims against Attorney General James and for use of excessive force, violation of equal protection, deliberate indifference based on conditions of pre-trial detention, and denial of access to the courts are also dismissed.  Plaintiff's Section 1983 claims against Officer Toto for unreasonable stop and frisk, false arrest, and unlawful search, though sufficiently alleged, will be stayed pending the resolution of Plaintiff's state criminal case.  At this time, the Court does not direct service of the

1

SAC on Officer Toto, and instead administratively closes this matter.  Plaintiff may seek to reopen this matter once his state criminal case has been fully resolved.

## BACKGROUND[1]

### I.    Procedural History

On October 19, 2020, Plaintiff filed a *pro se* Amended Complaint (Dkt. 5), which the Court construed to contain several Section 1983 claims related to his arrest and pre-trial incarceration at Rikers Island, as well as a Section 2241 habeas claim seeking release from custody.  (*See* generally M&O, Dkt. 9.)  In the December 16, 2020 M&O, the Court dismissed the Honorable Barry Kron, District Attorney Melinda Katz, Assistant District Attorney ("ADA") Genevieve Gadaleta, and defense attorney Richard Cary Spivack as immune to suit.  (*See id.* at 6–9.)  The Court also granted Plaintiff leave to file an amended pleading in the form of an SAC,

> to allege, if he can do so in good faith, facts that may serve to cure the deficiencies identified in this Memorandum and Order with respect to any: (1) Section 1983 claims on the bases of an unreasonable investigatory stop, unlawful search, unlawful arrest, excessive use of force, discrimination on the basis of race, and/or deliberate indifference to the risk of Plaintiff contracting COVID-19 while in custody at Rikers Island; (2) Section 2241 habeas claim challenging the conditions of his pretrial confinement at Rikers Island; and/or (3) claims against New York State Attorney General Letitia James or Officer Toto.

(*See id.* at 26.)  The Court instructed Plaintiff that the SAC would replace his previously filed complaint and "must stand on its own without reference to the Amended Complaint, nor any documents filed as exhibits to that complaint."  (*Id.*)  The Court explained that, if submitted within 60 days, the SAC would be reviewed for compliance with the requirements set forth in the M&O and for sufficiency under 28 U.S.C. § 1915(e)(2)(B).

---

[1] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

On January 11, 2021, the Court issued an Order in response to a letter submitted by Plaintiff (Dkt. 10), explaining that Plaintiff's letter did not cure the deficiencies in the Amended Complaint, reminding Plaintiff of his opportunity to submit an SAC, and directing Plaintiff that he may include a claim alleging denial of access to the courts in the SAC if he could "identify the specific harm to his criminal and/or civil cases that access to the law library would have prevented" and "the individual(s) who were personally involved in this alleged violation, and/or state a claim against the City of New York." (1/11/2021 Docket Order.)

On February 25, 2021,[2] the Court received Plaintiff's 139-page SAC, which includes, among other things, handwritten and typed allegations and arguments, jail grievance forms, news articles and other documents related to COVID-19 conditions at Rikers Island, and transcripts from the criminal case currently pending against Plaintiff in Queens Supreme Court, *People v. Williams*, No. 30-2020. (*See generally* Dkts. 11, 11-1.) On March 3, 2021, the Court received additional, similar materials supplementing the SAC (*see generally* Dkts. 13, 13-1, 13-2, 13-3, 13-4), which the Court incorporated into the SAC (3/11/2021 Docket Order). The Court has reviewed and considered all of these materials in its ruling, with particular attention to those portions of the SAC that appear to have been authored by, or perhaps on behalf of, Plaintiff and that allege specific

---

[2] Sixty days from the date of the M&O was February 16, 2021, accounting for the federal holiday on February 15, 2021. Although Plaintiff indicates that he mailed the SAC on February 5, 2021 (Dkt. 11, at ECF 5), the SAC is postmarked February 18, 2021 (*id.* at ECF 139) and was received by the Court's *Pro Se* Office on February 25, 2021. Under the prison mailbox rule, a complaint by an incarcerated *pro se* plaintiff is filed when it is turned over to prison officials for mailing. *See Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993), *modified on other grounds*, 25 F.3d 81 (2d Cir. 1994); *Alli v. Steward-Bowden*, No. 11-CV-4952 (PKC) (KNF), 2012 WL 6217653, at *1 (S.D.N.Y. Dec. 6, 2012). Given the unique challenges faced by a *pro se* prisoner litigant who "cannot even place his complaint directly into the hands of the United States Postal Service" and "has no control over the processing of his complaint," *see Dory*, 999 F.2d at 682, and the fact that the date the SAC was mailed or postmarked is within days of the February 16 deadline, the Court treats the SAC as timely filed.

facts in support of Plaintiff's claims that his constitutional rights have been violated.  (*See, e.g.*,

Dkt. 11, at ECF 1–5, ECF 10–12, ECF 41–52, ECF 54–58; Dkt. 11-1, at ECF 55; Dkt. 13; Dkt.

13-1, at ECF 1–7.)

## II.     Factual Background[3]

Plaintiff was arrested on August 16, 2019 in connection with an armed robbery.  (*See* Dkt.

11, at ECF 1–3, 41.)  Plaintiff explains the events that led to his arrest, alleging that he "innocently

discovered a bag" on the street "and went through it being curious and intended to return it to its

rightful owner[,] when police approached him and basically '<u>framed</u>' him for the robbery assuming

he was the alleged perpetrator in the robbery, when he wasn't."[4]  (*See id.* at ECF 2–3 (emphasis in

original).)  Plaintiff asserts that he was then "searched and a pellet gun was discovered which he

[] planned to surprise his nephew with," but was "deprived of due to police charging this as an

arm[ed] robbery, [t]he weapon falsely."  (*Id.* at ECF 3.)  Plaintiff also asserts that because the

police testified that "they circled around the block" after first spotting him, this means that the

police "weren't sure [Plaintiff] was the suspect at all[,] which suggest[s] they simply gave

[Plaintiff] these charges arbitrarily."  (*Id.*)

With respect to the violation of his rights, Plaintiff alleges that "NYPD Officer John Toto"

"illegally stopped, seized and searched and later arrested him" and that "'reasonable suspicion'

and 'probable cause' were '<u>non[-]existent</u>' in this case."  (Dkt. 13-1, at ECF 3 (emphasis in

---

[3] For purposes of this section, the Court accepts, as it must, the relevant non-conclusory factual allegations of the SAC. *See Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (per curiam) (citation omitted).

[4] The handwritten statements from the SAC generally begin each word with an upper-case letter.  For ease of review and clarity, the Court notes that it has altered all quotations without indication, using lower-case letters rather than upper-case letters where grammatically appropriate, unless otherwise indicated.

original).)  Plaintiff also alleges that his stop and arrest constituted "'<u>racial profiling</u>' deem[ed] illegal just like in <u>Floyd v. City of New York</u>[.]"[5]  (Dkt. 11, at ECF 4 (emphasis in original) (asserting that like the plaintiffs in *Floyd*, his stop by the police "precipitated [] an unlawful arrest, an unreasonable stop, search, and investigation, a suggestive arrest, misidentification and everything that followed"); *see* Dkt. 11-1, at ECF 11 ("stop me because I was Black."), ECF 34 (noting,[6] in substance, that Officer Toto's description of the robbery suspect as "male black" was racist).)  In addition, Plaintiff asserts that Officer Toto relied on a "vague" and incomplete description of the suspect that Plaintiff did not even match.  (*See* Dkt. 13-1, at ECF 3 ("Radio transmissions gave not one but several descriptions of a suspect[,] which was 'vague.'"); Dkt. 11-1, at ECF 28 (noting that Plaintiff did not "fit the description" because he is "not five feet"); *id.* at ECF 31 (noting that Plaintiff's stop was an "[i]llegal [s]top & [f]risk" and arrest because Officer Toto "never had the full description before [] stopp[ing] [and arresting] him").)  Specifically, Plaintiff alleges:

> [T]he pretrial discovery included the police body camera video[,] 911 calls[,] police radio transmissions and police paperwork.  The complaining witness is heard on the 911 call describing the perpetrator as 5 feet tall wearing a black baseball cap, black t-shirt and black jeans, which is also the description in the police radio transmission[; however,] the police body camera video[7] shows [Plaintiff] wearing

---

[5] The Court assumes that Plaintiff is referring to the class action lawsuit, *Floyd v. City of New York*, 959 F. Supp. 2d 540, 667 (S.D.N.Y. 2013), in which the district court found, among other things, that New York City was liable for Fourth and Fourteenth Amendment violations based on a policy of unreasonably and discriminatorily stopping and frisking Black men.

[6] Plaintiff has provided annotated transcripts from proceedings in the criminal case that is currently pending against him.  (*See, e.g.*, Dkt. 11, at ECF 60–83; Dkt. 11-1, ECF 1–38; Dkt. 13-1, at ECF 9–27.)  Upon inspection, it appears that the notations on the transcripts are in several different people's handwriting.  The Court assumes that because the annotated transcripts were included in the materials filed with the SAC that Plaintiff intends the notations to be considered as part of his pleading.  To the extent a transcript notation supports a claim otherwise stated by Plaintiff elsewhere in the SAC, the Court has considered that notation.

[7] Plaintiff alleges that "the video body cam was altered and the people took this to the grand jury knowing that the [Plaintiff] was going to the hospital any way because [h]is blood pressure

a camouflage cargo shorts at the time of his initial identification.   The police paperwork and fingerprint response summary list [Plaintiff's] height as 5'10".

(Dkt. 11, at ECF 46.)  Plaintiff further alleges that during his grand jury testimony, Officer Toto

stated that he identified Plaintiff from a distance of "500 yards" or "5 football fields" away, which

is "incredible" (Dkt. 13-1, at ECF 3–4), and that Officer Toto perjured himself by lying about the

description he received and relied upon when stopping and arresting Plaintiff (*id.* at ECF 4 ("P.O.

Defendant Toto perjured himself and unreasonably stopped the wrong suspect and was obviously

'coached' by the DA to get Plaintiff indicted 'wrongfully.'"); Dkt. 11-1, at ECF 23–24 (noting

alleged lies in Officer Toto's testimony), ECF 33–35 (same).)

Plaintiff also alleges that the robbery victim's identification of him as the perpetrator was

"unduly suggestive" because at the time of the identification the victim was in the backseat of a

police vehicle, on the opposite side of the street from where Plaintiff was already being detained

by police, there were flashing lights from several police vehicles, and "the complaining property"

was "on the hood of the car" near Plaintiff.[8]  (Dkt. 11, at ECF 46–47 ("[The] complaining witness

came to where I was[,] then they showed her the [stolen] cell phone and told her to keep it before

_____

was high."  (Dkt. 11, at ECF 47.)  The Court is not sure what Plaintiff means by this allegation, but finds that Plaintiff fails to plead any facts to support the assertion that the body camera video from his stop and/or arrest was altered.

[8] Plaintiff alleges that during the grand jury proceedings, ADA Gadaleta did not answer the jurors' "legitimate question" of whether a line-up was conducted, and thereby "impaired the integrity of the grand jury."  (*See* Dkt. 11, at ECF 2; Dkt. 13-1, at ECF 1–2.)  However, as the Court explained in its prior order dismissing ADA Gadaleta from this action, prosecutors are absolutely immune for all acts associated with the "judicial phase of the criminal process," which includes grand jury proceedings.  (M&O, Dkt. 9, at 7–8 (quoting *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013)).)  The Court also notes that in response to a juror's question about the use of a photo array, ADA Gadaleta responded that she could not "ask [the robbery victim] about police procedures in this case," but confirmed that the victim saw Plaintiff again approximately 10 minutes after the victim's items were stolen.  (Dkt. 11, at ECF 66–67.)  For the reasons already stated in the M&O, Plaintiff's claims against ADA Gadaleta may not proceed and she remains dismissed.  (*See* M&O, Dkt. 9, at 7–8.)

being asked to identify [Plaintiff][.]"[9]); Dkt. 11-1, at ECF 55.)  In addition, Plaintiff alleges that

"there was a 'mistaken identity' where police apparently 'coached and coerced' an alleged victim

into saying it was Plaintiff involved in robbery in a very 'sugges[tive]' manner[,]" which "resulted

in misidentification by grand jury testimony where witness never mentioned any color of the cap,

hat or T-shirt the suspect wore."  (Dkt. 11, at ECF 2.)

    With respect to the conditions of his pre-trial detention, Plaintiff alleges that "NYCDOC

at AMKC Warden"[10] and the City of New York

> are liable for not protecting [him] from COVID-19 corona virus because [he] caught it at
> Rikers, where the facility failed to use protective measures by not enforcing social
> distancing, piling inmates up where [he] was forced to live in housing units with 30, 40,
> and 50 inmates at Rikers at a time and in dorms where [he] contracted it.
>
> [He] was subjected to inmates moving from unit to unit frequently, when on court dates
> inmates infected are piled in bullp[e]ns together, where guards have failed to be tested daily
> before reporting to work and contracting it from guards, where [he is] not afforded hand
> sanitizers and cleaning supplies are scar[ce] to clean surfaces at the jail, including not daily
> cleaning phones.
>
> Although the Executive Order from Cuomo require 50% housing[,] this can't be reached
> as admitted by DOC Commissioner Brann [in a recent news article].

(Dkt. 13-1, at ECF 4–5; *see also* Dkt. 11, at ECF 1, 10.)  Plaintiff further alleges that his housing

unit was "purposely filled[,] making the count of people over forty-eight people within a week"

and that they were "sleeping 2.6 feet" apart, causing people to become "sick with fever, chills,

---

[9] Plaintiff appears to allege that the body camera footage capturing the robbery victim's
identification of Plaintiff was "altered," however Plaintiff does not plead any facts in support of
this allegation.

[10] The Court assumes that all references to "NYCDOC" and "DOC" refer to the New York
City Department of Correction, *see About the Department of Correction*, NYC,
https://www1.nyc.gov/site/doc/about/about-doc.page (last visited June 2, 2021), and that "AMKC
Warden" refers to the Warden of the Anna M. Kross Center, one of the facilities at Rikers Island,
where Plaintiff is currently incarcerated.  *See* https://www1.nyc.gov/site/doc/about/facilities-
locations.page (last visited June 2, 2021.)

sweats, cough, sneezing[,] body aches and breathing issues," as well as "chest pains and no energy

to get out of bed." (Dkt. 11, at ECF 10.) Within one week, Plaintiff alleges, "half the cell units

became ill with [the] same symptoms."[11] (*Id.*) Relatedly, Plaintiff alleges that the "DOC has failed

to do their part in enforcing measures to protect" him by crowding housing units, moving inmates

"in and out" "at random," and painting "Xs" on benches only 3 feet apart, rather than the

recommended 6 feet. (Dkt. 13, at ECF 1.)

Moreover, Plaintiff alleges that "[n]o on[e] has proper protective equipment" and "New

York City has failed to provide an adequate supply of supplies." (Dkt. 11, at ECF 11.) Many staff

have gotten sick, creating staff shortages that require staff to do "double and triple shifts." (*Id.*)

Further, "[d]espite [] professional Doctors and clinicians' recommendations[,] the City of NY

insisted on officers and staff to return to work regardless of their health situation and symptoms[,]

therefor[e] condemning staff and prisoners at Rikers Island to death and serious illness [due to the]

COVID 19 virus." (*Id.*) As a result, Plaintiff alleges that "[s]everal hundred officers and staff,

400 plus and several inmates near 300 has been tested positive for the corona virus and many have

died." (*Id.*)

Regarding his own health, Plaintiff alleges that he is over 50 years of age and has asthma,

which "places him at serious risk in contracting the [COVID-19] virus or death." (*Id.* at ECF 1.)

He also asserts that because he has "asthmatic hypertension, heart and kidney disease and other

serious chronic medical conditions," his continued pretrial detention during the COVID-19

pandemic is unlawful and violates the Fourteenth Amendment. (*Id.* at ECF 57.) Further, Plaintiff

alleges that he has been examined by medical department officials who have diagnosed him with

---

[11] Plaintiff provides a document in which he identifies by name and ID number individual
detainees in his housing unit that he claims have had COVID-19. (Dkt. 11, at ECF 55–57.)

"numerous ailments & medical complications which ultimately put[] [him] at risk of contracting COVID again from the jail."  (Dkt. 13, at ECF 1.)  Plaintiff demands "compassionate release." (*Id.* at ECF 1–2.)

In addition to these allegations, Plaintiff also alleges that the "DOC and their superiors" denied him access to the courts and ignored his grievances.  (Dkt. 11, at ECF 3–4.)  In particular, Plaintiff alleges that denial of access to the law library "to do research and use [] the typewriter to prepare pleadings" directly resulted in an "adverse decision on divorce."  (*Id.* at ECF 4; *see also* Dkt. 11-1, at ECF 55.)  Plaintiff asserts that even though the DOC's "excuse" is COVID-19, detainees still must have access to the courts during the pandemic.  (Dkt. 11, at ECF 4.)

With respect to Attorney General James, Plaintiff alleges that she "failed to conduct an adequate investigation" into Plaintiff's complaint against Officer Toto "and others of the 106th [precinct,]" "the Queens & Brooklyn County NYPD," and "the Court Officials[,] DAs and Judge." (Dkt. 13-1, at ECF 2.)  More specifically, Plaintiff alleges that Attorney General James "[was] required" to investigate his complaint that the arresting officer "racially profiled" him and performed an illegal "stop and frisk," and that her failure to do so was "official misconduct" that makes her liable in her "official & individual capacity," and "mak[es] her ultimately part of the collusion cover up."  (*Id.* at ECF 2–3.)

In sum, Plaintiff claims that his "4th, 8th, 6th, 1st[,] and 4th Amendment Constitutional Rights" have been violated.  (Dkt. 13-1, at ECF 5–6.)  Plaintiff seeks a declaratory judgment that Defendants are liable, a jury trial against Defendants in their "individual & official capacity," permission to "proceed in this action and survive dismissal," "compensatory, nominal, and punitive damages in the amount of 3 million dollars," and Plaintiff's release from prison as "compassionate relief."  (*Id.* at ECF 6–7.)

## LEGAL STANDARD

The Prison Litigation Reform Act, 28 U.S.C. § 1915A, requires this Court to review the complaint in a civil action in which a prisoner seeks redress from a governmental entity or from officers or employees thereof, and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b); *see Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). Similarly, pursuant to the *in forma pauperis* statute, a district court must dismiss a case if the court determines that the complaint "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

A complaint must plead facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although all allegations contained in the compliant are assumed to be true, this tenet is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A document filed *pro se* is to be liberally construed, and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)); *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) ("[A] court is obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations.").  "If [a] liberal reading of the complaint 'gives any indication that a valid claim might be stated,' the Court must give the plaintiff an opportunity to amend the complaint." *Nelson-Charles v. U.S. Dep't of Educ.*, No. 19-CV-1616 (PKC) (PK), 2019 WL 1675999, at *2 (E.D.N.Y. Apr. 16, 2019) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

## DISCUSSION

### I.     Plaintiff's Section 2241 Claim

In the M&O, the Court construed Plaintiff's demand for release from custody in the Amended Complaint as a request for habeas corpus relief under 28 U.S.C. § 2241 and dismissed that request without prejudice because Plaintiff had not demonstrated exhaustion of all available state-court remedies, including "appealing all the way up to the New York Court of Appeals." (M&O, Dkt. 9, at 11–14 (citing, *inter alia*, *Griffin v. Warden of the Otis Bantum Corr. Ctr.*, No. 20-CV-1707 (AJN) (SLC), 2020 WL 1158070, at *3 (S.D.N.Y. Mar. 10, 2020)).)   The Court granted Plaintiff the opportunity to amend his habeas claim to demonstrate that he has fully exhausted available grounds for relief in state court, or in the alternative, to explain to the Court why exhaustion of state-court remedies would be futile, impossible, or subject him to undue prejudice.   (*Id.* at 14.)

The Court has reviewed the SAC and concludes that Plaintiff has not pled any additional facts to demonstrate either that he has exhausted state-court remedies or that exhaustion would be futile, impossible, or subject him to undue prejudice.   While the SAC includes one page of an August 13, 2020 Decision, Order, & Judgment by the Supreme Court of the State of New York, Appellate Division, Second Judicial Department, which appears to deny Plaintiff's writ of habeas corpus seeking release or, in the alternative, reasonable bail (*see* Dkt. 11, at ECF 59), Plaintiff fails to demonstrate that this decision was appealed to the New York Court of Appeals, or that doing so would be futile or impossible, or would subject him to undue prejudice.   Therefore, Plaintiff's Section 2241 habeas claim is dismissed based on his failure to exhaust all available state-court remedies.

## II.       Plaintiff's Section 1983 Claims[12]

Section 1983 provides a vehicle for redressing the deprivation of civil rights.  "Section 1983 'is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.'"  *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 438 (E.D.N.Y. 2012) (quoting *Baker v. McCollan*, 443 U.S 137, 144 n.3 (1979)); *accord Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).  In order to maintain a civil rights action under Section 1983, a plaintiff must allege two essential elements.  First, the conduct challenged must have been "committed by a person acting under color of state law."  *Cornejo*, 592 F.3d at 127 (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." (internal quotation marks and citation omitted)).  Second, the conduct complained of "must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."  *Cornejo*, 592 F.3d at 127 (quoting *Pitchell*, 13 F.3d at 547); *see also Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

### A.       New York State Attorney General Letitia James

In the M&O, the Court construed Plaintiff's Amended Complaint as making a Section 1983 claim against Attorney General James in her official capacity in relation to his request for an

---

[12] To the extent Plaintiff alleges that his "'speedy trial' statutory rights were violated in this case" and demands dismissal of the indictment (*see* Dkt. 11, at ECF 4, 5; Dkt. 11-1, at ECF 55), the Court cannot interfere in Plaintiff's ongoing state court criminal case.  *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013) ("When there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution."); *Younger v. Harris*, 401 U.S. 37, 53–54 (1971).  The Court also notes that in one of the transcripts included with the SAC, the state court Judge explained to Plaintiff that "[t]he People have not been going slow.  This is, in fact, the first hearing this Court has done since February and you are it.  So they were trying to move you along.  And here we are."  (Dkt. 13-1, at ECF 33.)

investigation into the "judge in [his] case" and the "officers in [his] case.  (M&O, Dkt. 9, at 9–10; *see also* Amended Complaint ("Am. Compl."), Dkt. 5, at ECF 72.)  However, finding that Plaintiff had failed to provide any facts explaining how, if at all, Attorney General James violated his rights and what, if any, relief he sought with respect to those violations, the Court granted Plaintiff leave to amend his claim against Attorney General James to (1) allege, in good faith, how she violated his rights in her official capacity, including any ongoing violations of federal law, and (2) describe the type of *prospective* relief sought.  (*See* M&O, Dkt. 9, at 11.)  Plaintiff now alleges in the SAC that Attorney General James either failed to conduct or inadequately conducted an investigation into his complaint against Officer Toto for an alleged illegal "stop and frisk" based on racial profiling, and against other NYPD officers, court officials, prosecutors, and judges.[13]  (*See* Dkt. 13-1, at ECF 2–3.)

Plaintiff's SAC fails to cure the deficiencies previously identified by the Court and ultimately fails to state a claim against Attorney General James.  As the Court explained in the M&O, Attorney General James is afforded immunity under the Eleventh Amendment for Section 1983 claims brought against her in her official capacity, with a limited exception for complaints alleging "ongoing violation[s] of federal law" and seeking "relief properly characterized as prospective."  (M&O, Dkt. 9, at 10 (citing, *inter alia*, *CSX Transp., Inc. v. New York State Office of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002)).)  Plaintiff has not alleged ongoing violations of federal law and is not seeking prospective relief.  To the extent the SAC may be construed to

---

[13] To the extent the SAC may be construed to allege that Attorney General James was involved in a "collusion cover up" or conspiracy (Dkt. 13-1, at ECF 2–3), the Court finds that Plaintiff fails to include any facts to support a conspiracy claim, the elements of which are "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citation omitted).

allege a due process violation based on an alleged failure to investigate, "[c]ourts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." *Bernstein v. New York*, 591 F. Supp. 2d 448, 460, 465 (S.D.N.Y. 2008) (alteration and quotation omitted) (dismissing claim against the Attorney General for failing to investigate and respond to plaintiff's complaints); *see also Adamczyk v. Annucci*, No. 16-CV-239 (LJV), 2019 WL 6123746, at *2 (W.D.N.Y. Nov. 19, 2019) (dismissing due process claim premised on the Commissioner of the New York State Department of Corrections and Community Supervision's alleged failure to investigate plaintiff's termination because "there is no constitutional right to an investigation by government officials"); *Troy v. City of New York*, No. 13-CV-5082 (AJN), 2014 WL 4804479, at *6 (S.D.N.Y. Sept. 25, 2014) ("It is well established that there is no constitutional right to an investigation by government officials." (alterations and citations omitted)), *aff'd*, 614 F. App'x 32 (2d Cir. 2015) (summary order).  Furthermore, Attorney General James's decision of whether to act upon Plaintiff's complaints, or not, is privileged.  *See Scolnick v. Lefkowitz*, 329 F.2d 716, 716 (2d Cir. 1964) (per curiam) (finding that the Attorney General's alleged "failure to investigate and act upon reports [by plaintiffs] of an underworld plot to injure them" was "conduct [that] is clearly privileged as in the exercise of their official, quasi-judicial functions").  Thus, Plaintiff fails to state a claim against Attorney General James in her official capacity,[14] and she is dismissed.

---

[14] Furthermore, as the Court previously explained, a claim against Attorney General James in her personal capacity must allege her personal involvement in the alleged constitutional deprivations.  (M&O, Dkt. 9, at 11 n.9 (citing *Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019) ("It is well-settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation omitted))).)  Putting aside that Plaintiff has not identified any cognizable constitutional deprivation, Plaintiff also has not alleged any facts to demonstrate Attorney General James's personal involvement in responding to his complaint and request for an investigation.

### B.      Officer John Toto

In the M&O, the Court noted that although several of Plaintiff's allegations relate to the circumstances of Plaintiff's stop and arrest, he did not allege Officer Toto's personal involvement in any of the alleged violations.  (M&O, Dkt. 9, at 11.)  For that reason, the Court permitted Plaintiff leave to amend his claim against Officer Toto if he could allege, in good faith, facts showing Officer Toto's personal involvement in any of the alleged constitutional deprivations. (*Id.*)

To start, in the SAC, Plaintiff identifies Officer Toto's as the police officer who "illegally stopped, seized and searched and later arrested" him.  (Dkt. 13-1, at ECF 3.)  Therefore, because Plaintiff has identified Officer Toto's "personal involvement" in the "alleged constitutional deprivations," he has satisfied a prerequisite for stating a claim under Section 1983.  *See Brandon*, 938 F.3d at 36.  Next, in support of his claims that Officer Toto subjected him to an illegal stop, search, and arrest, Plaintiff alleges that, like the plaintiffs in *Floyd*, he was racially profiled because he is Black.  (*See* Dkt. 11, at ECF 4; Dkt. 11-1, at ECF 11; Dkt. 13-1, at ECF 3.)  Plaintiff also alleges that in stopping and arresting him, Officer Toto relied on a "vague" or incomplete description of the suspect, *i.e.*, black male, dark colored T-shirt, and baseball cap (*see* Dkt. 11-1, at ECF 28, 31; Dkt. 13-1, at ECF 3), and that Plaintiff did not fit the description provided by the victim because he is five feet, ten inches tall and was wearing camouflage cargo shorts at the time he was identified (*see* Dkt. 11, at ECF 46; Dkt. 11-1, at ECF 28, 31).  In addition, Plaintiff alleges that he was arrested based in part on an "unduly suggestive" "showup identification" by the victim.[15]  (*See* Dkt. 11, at ECF 46–47; Dkt. 11-1, at ECF 55.)

---

[15] To the extent Plaintiff also alleges that Officer Toto perjured himself in his grand jury testimony (*see* Dkt. 13-1, at ECF 4), as the Court explained in the M&O, police officers are absolutely immune from civil suit based on false testimony offered during grand jury proceedings. (*See* M&O, Dkt. 9, at 18 n.18 (citing, *inter alia*, *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) ("The

Construing the SAC liberally and assuming, as it must, the factual allegations to be true, the Court concludes that Plaintiff has adequately stated claims against Officer Toto for unreasonable stop and frisk,[16] false arrest, and unlawful search, but has failed to state claims for excessive force and discrimination based on race.

### 1.   Unreasonable Stop and Frisk

In "appropriate circumstances and in an appropriate manner" the police may "approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)).   A so-called "stop and frisk" does not violate the Fourth Amendment's limits on searches and seizures if the police officer conducting the stop and frisk (1) "reasonably suspects that the person apprehended is committing or has committed a criminal offense," and (2) "reasonably suspect[s] that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009) (citation omitted).   "Reasonable suspicion must be based on specific and articulable facts," *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quotation and citation omitted), and a consideration of "the totality of the circumstances . . .

---

factors that justify absolute immunity for trial witnesses apply with equal force to grand jury witnesses . . . [and] there [is no] reason to distinguish law enforcement witnesses from lay witnesses.")).)   Further, to the extent Plaintiff alleges that a police officer coached or coerced the robbery victim into identifying Plaintiff as the perpetrator (*see* Dkt. 11, at ECF 2), he does not identify Officer Toto's or any other officer's personal involvement in this alleged violation, nor does he offer more than conclusory statements about coaching and coercion.  Therefore, the Court finds that Plaintiff fails to state a claim with respect to this allegation.

[16] Although the M&O did not identify a claim for an unconstitutional frisk, the Court now recognizes the potential for such a claim based on its review of the SAC, which includes testimony by Officer Toto in which he describes frisking Plaintiff prior to arresting him.  (*See* Dkt. 11, at ECF 72–73 ("I began to frisk the defendant . . . [a] frisk is a general pat down on the outer garments [] of a person.  We generally conduct frisks to keep our safety and see if the defendant's concealing any weapons. . . .  I felt the outline of a firearm on the defendant's left side . . . [and then] [p]laced the defendant under arrest.").)

through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (quotation and citation omitted). An investigatory stop cannot be justified by events that occur after a stop is effectuated; rather a stop "must be 'justified at its inception.'" *Freeman*, 735 F.3d at 96 (quoting *Terry*, 392 U.S. at 20).

The Court finds that Plaintiff has stated a claim for unreasonable stop because, although he may have fit a vague and generic description of the suspect in terms of race and gender, *i.e.*, black male, Plaintiff plausibly alleges that he did not fit the more specific aspects of the suspect's description in terms of height and clothing. *See Dancy*, 843 F.3d at 109 (finding that a description of a "thin, black male wearing a brown jacket traveling in an unknown direction" was "too vague" under the circumstances to justify stopping plaintiff who was "thin, black, and male" but "wearing a camouflage-patterned jacket"); *see also Brown v. City of Oneonta, New York*, 221 F.3d 329, 334 (2d Cir. 2000) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure"). Moreover, the fact that Plaintiff's gender and race characteristics may have matched the description of the suspect is "not enough to support reasonable suspicion where [Plaintiff] was only in general temporal and geographical proximity to the crime." *Ferguson v. City of New York*, No. 17-CV-4090 (BMC), 2018 WL 3233131, at *3 (E.D.N.Y. July 2, 2018), *rev'd on other grounds on recons.*, 2018 WL 3626427 (E.D.N.Y. July 30, 2018). Plaintiff was stopped, frisked, and arrested approximately 20 minutes after Officer Toto received the radio run reporting the robbery (*see* Dkt. 11, at ECF 71–73, 79), on a public street approximately 10 blocks or a little over half a mile[17] from the site of the crime (*see* Dkt. 11, at

---

[17] The Court takes judicial notice of the approximate distance between the intersection where the victim reported that she was robbed, Liberty Avenue and the 80th Street subway stop in Queens County (*see* Dkt. 11, at ECF 60–62), and the intersection where Plaintiff was stopped,

ECF 60–62).[18]   Such general proximity to the crime does not support a finding of reasonable suspicion to justify a stop otherwise based only on Plaintiff's race and gender.  *Compare Ferguson*, 2018 WL 3233131, at *3–4 (finding that police lacked reasonable suspicion to stop a plaintiff more than 30 minutes after the crime in "an 'innocuous' public area where many people (some or many of whom might fit the description of a short black male) might pass by"); *with United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) (finding that police had reasonable suspicion to stop a plaintiff who was just 200 feet from the crime scene and a few minutes after the reported burglary).  Therefore, the Court concludes that Plaintiff has adequately stated a claim against Officer Toto based on an unreasonable and unjustified stop.

The Court likewise concludes that Plaintiff has adequately stated a claim against Officer Toto based on an unreasonable frisk.  *See Arizona*, 555 U.S. at 326–27 (explaining that for a "stop and frisk" to be constitutional, "[f]*irst*, the investigatory stop must be lawful" (emphasis added)).  Following a lawful stop based on reasonable suspicion that the person apprehended is committing

---

Eldert Lane and Conduit Boulevard in Kings County (*see* Dkt. 11, at ECF 70; Dkt. 11-1, at ECF 10).  *See* https://www.google.com/maps/dir/Liberty+Ave+%26+80th+St,+Queens,+NY+11416/Eldert+Lane+%26+Conduit+Boulevard,+Brooklyn,+NY/@40.677619,-73.8634932,17z/data=!3m1!4b1!4m14!4m13!1m5!1m1!1s0x89c25decebf2fb63:0xbdbdd279b038da0d!2m2!1d-73.8577887!2d40.6794588!1m5!1m1!1s0x89c25d95914c590b:0x2b37c67465626771!2m2!1d-73.8643639!2d40.6756782!3e2 (last visited June 8, 2021).

[18] The Court acknowledges that the SAC includes a transcript of Officer Toto's testimony in which he indicated that his decision to approach Plaintiff may have been informed by his observation of Plaintiff at the intersection of Eldert Lane and North Conduit "bending down and rifling through a bag and just staring [] as [Officer Toto and his partner] passed" (Dkt. 11, at ECF 70) and/or because "the cell phone that was taken from the robbery was being tracked and it was pinging at that intersection" (Dkt. 11-1, at ECF 10).  However, Officer Toto's testimony concerning the events leading to Plaintiff's stop are somewhat inconsistent and unclear.  Therefore, in light of Plaintiff's allegations and the lenient standard at this stage, the Court concludes that Plaintiff has adequately stated a claim for unreasonable stop.

or has committed a *violent* crime, a frisk of the person's outer garments may be justified.  *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 652 (S.D.N.Y. 2013) (following a lawful stop, officers were justified in frisking outer garments for weapons because "burglary is often a violent crime"); *cf. id.* at 648 (following a lawful stop, officers had "no basis to frisk" because the stop was based on a woman's report that a man had been verbally harassing her, but she "never said she believed her harasser was armed, or that she had been physically threatened").  Although Officer Toto was responding to a report of an armed robbery, because Plaintiff has plausibly alleged that the stop was unjustified, he has stated a claim for an unjustified frisk resulting from that stop.  Furthermore, even though Plaintiff alleges that he was looking through a bag at the time Officer Toto approached him (*see* Dkt. 11, at ECF 2–3), this conduct, when considered in the context of the limited information allegedly known to Officer Toto at the time, does not give rise to reasonable suspicion that Plaintiff was armed and dangerous.[19]  *Cf. United States v. Lopez*, 321 F. App'x 65, 67–68 (2d Cir. 2009) (summary order) ("When [defendant] saw the [police Sergeant] approaching him, [defendant] transferred the cup from his right to his left hand and dropped his right hand to his right side.  Based on these facts, it was reasonable for [the police Sergeant] to suspect that [defendant] was carrying a weapon.").  Therefore, the Court finds that Plaintiff has adequately stated a claim against Officer Toto for an unreasonable and unjustified frisk.

2. <u>False Arrest and Unlawful Search</u>

Turning now to Plaintiff's claims for false arrest and unlawful search.  The elements of a false arrest claim are "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was

---

[19] The Court notes Officer Toto's testimony that, after observing Plaintiff with a bag at his feet and a few items on the hood of a car, he frisked Plaintiff "due to the nature of the crime that we were investigating or canvassing for."  (Dkt. 11-1, at ECF 13.)  Other than this testimony, Officer Toto did not appear to offer any further explanation why he believed that Plaintiff was armed and dangerous.

conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (citation omitted). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest[.]'" *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citation omitted). Probable cause exists when arresting officers have "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Hernandez*, 939 F.3d at 199 (citation omitted). A search incident to a lawful arrest is permissible if it "include[s] the arrestee's person and the area within his immediate control[,] . . . mean[ing] the area from within which he might gain possession of a weapon or destructible evidence." *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (quotation omitted).

Plaintiff alleges that Officer Toto did not have probable cause to arrest him because he relied on a vague description and one that Plaintiff did not match in terms of height or clothing. (*See* Dkt. 13-1, at ECF 3; Dkt. 11-1, at ECF 31–32.) "It has long been established, . . . that when [a] description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist." *Jenkins*, 478 F.3d at 90 (citing, *inter alia*, *Wong Sun v. United States,* 371 U.S. 471, 481 (1963)). Plaintiff also alleges that his arrest was based on an "unduly suggestive" identification by the robbery victim that occurred when Plaintiff was being detained by police, with the stolen property nearby, and when the victim's view was obstructed by distance and flashing lights from police vehicles. (Dkt. 11, at ECF 46–47; Dkt. 11-1, at ECF 55.) "An identification cannot be used to support probable cause if the identification procedure was so defective that probable cause could not reasonably be based upon it." *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017) (quotation omitted). The type of identification at issue here—a

20

"showup" identification, *i.e.*, the presentation of a single suspect to a witness by the police, rather than a lineup of several individuals including the suspect—is "inherently suggestive" and has been "widely condemned," although it may be permissible under exigent circumstances or when conducted in "close temporal and geographic proximity to the crime scene." *See Brisco v. Ercole*, 565 F.3d 80, 88–89 (2d Cir. 2009) (quotations omitted).  The Court finds that Plaintiff has adequately stated a false arrest claim based on allegations that Officer Toto arrested him in reliance on a vague description that he did not match and on an unduly suggestive showup identification. Because Plaintiff has adequately stated a claim for false arrest, the Court finds that he has likewise stated a claim for an unlawful search incident to that arrest, which yielded a pellet gun.[20]  *See Chillemi v. Town of Southampton*, No. 12-CV-3370 (JFB) (AKT), 2017 WL 6520722, at *15–16 (E.D.N.Y. Dec. 20, 2017) (denying summary judgment on a false arrest claim, and consequently, on an unreasonable search and seizure claim based on the same evidence, *i.e.*, that the police officer "lacked any basis for the initial stop . . . and, thus, there also was no basis for the search incident to arrest").

### 3.    Equal Protection Violation

Next, the Court considers Plaintiff's claim that he was subjected to racial profiling in violation of the Equal Protection Clause of the Fourteenth Amendment.  To state a race-based

---

[20] The Court notes that probable cause must be "evaluated on the totality of the circumstances," and the significance of a factor such as a vague description "may be enhanced or diminished by the surrounding circumstances" of the arrest. *Jenkins*, 478 F.3d at 90.  According to transcripts submitted with the SAC, Officer Toto testified that he placed Plaintiff under arrest for possession of a firearm after feeling the outline of a firearm when he frisked Plaintiff.  (*See* Dkt. 11-1, at ECF 13–14, ECF 20–21.)  Plaintiff concedes that when he was searched, a pellet gun was recovered from his person.  (*See* Dkt. 11, at ECF 3.)  Despite these facts, given that Plaintiff has plausibly alleged that his arrest was based on a vague description and unduly suggestive identification, which could support a finding that Officer Toto lacked probable cause, the Court will permit Plaintiff's false arrest and unlawful search claims to proceed at this time.

claim under the Equal Protection Clause of the Fourteenth Amendment, "a plaintiff must allege

that a government actor intentionally discriminated against him on the basis of his race." *Greene*

*v. City of New York*, No. 08-CV-243 (AMD) (CLP), 2017 WL 1030707, at *30 (E.D.N.Y. Mar.

15, 2017) (quoting *Brown*, 221 F.3d at 337), *aff'd,* 742 F. App'x 532 (2d Cir. 2018) (summary

order).  There are several ways a plaintiff may plead intentional discrimination:

> *First,* "[a] plaintiff could point to a law or policy that 'expressly classifies persons
> on the basis of race.'" *Second,* "a plaintiff could identify a facially neutral law or
> policy that has been applied in an intentionally discriminatory manner." *Third,* "[a]
> plaintiff could also allege that a facially neutral statute or policy has an adverse
> effect and that it was motivated by discriminatory animus."

*Floyd*, 959 F. Supp. 2d at 570–71 (quoting *Brown*, 221 F.3d at 337).  Here, Plaintiff has not

identified a particular law or policy he is challenging, other than to make conclusory reference to

*Floyd*, which, in itself, is insufficient to state an Equal Protection claim.  *See Brown v. City of New*

*York*, No. 18-CV-3287 (JPO), 2021 WL 1225948, at *2 (S.D.N.Y. Mar. 31, 2021) (explaining that

a plaintiff "who was arrested in 2015, cannot compensate for his failure to plead facts indicating

that his arrest was racially motivated by invoking *Floyd*'s analysis of a policy that ended in 2013").

Nor has Plaintiff alleged that he was subjected to a selective law enforcement action based on his

race by showing that similarly situated individuals of a different race were treated differently.  *See*

*Brown*, 221 F.3d at 337 (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)); *Floyd*, 959

F. Supp. 2d at 633 (finding that an individual was "stopped because of his race" where, *inter alia*,

"other non-black individuals were present and presumably behaving no differently than [him]—

yet only [he] was stopped").  In addition, Plaintiff has not alleged that the police were searching

for a particular perpetrator based *solely* on race, without more, because, by his own admission, the

police were searching for a particular perpetrator based on a victim's description that included

race, gender, height, and clothing.  *See Brown*, 221 F.3d at 338 (finding that plaintiffs failed to

state an Equal Protection claim because police were searching for a perpetrator based on a victim's description of a "young black man with a cut on his hand," which did not amount to an investigation based solely on race).  In sum, the Court concludes that even upon a liberal reading of the SAC, Plaintiff has failed to allege facts to support an Equal Protection claim.[21]

### 4.     Excessive Use of Force

Finally, the Court finds that Plaintiff has failed to state a claim for excessive force.  The Fourth Amendment prohibits the use of "unreasonable" force by a police officer effecting an arrest.  *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  In the M&O, the Court noted that "[a]lthough Plaintiff alleges that his arrest was made with the 'us[e] of physical force,' he does not identify the officer(s) who were personally involved in the use of force against him or offer any facts about the nature, circumstances or degree of force used, nor does he allege any injury resulting from any officer's use of force."  (M&O, Dkt. 9, at 23 (internal record citations omitted).)  The Court granted Plaintiff leave to amend with respect to an excessive force claim if he could, in good faith, satisfy these deficiencies.  He has not.  Although Plaintiff includes a conclusory reference to "excessive force" in the SAC (*see* Dkt. 11, at ECF 1), he does not plead any facts in support of such a claim.  Therefore, the Court finds that Plaintiff has not stated a claim for use of excessive force.

---

[21] The Court notes that a few of the handwritten notations on the transcripts included with the SAC could be read to imply that Officer Toto used racial slurs during the course of his encounter with Plaintiff.  (*See* Dkt. 11-1, at ECF 34 (noting "neggas he tolme," which the Court interprets to mean "niggas he told me"); *see id.* at ECF 35 (noting that when Officer Toto said the word "black" during his testimony he "stopped . . . from saying black nigger").)  Abhorrent as the implication of such allegations may be, "courts in this Circuit have found that '[t]he use of racial slurs, alone, fail to state a claim for a violation of the equal protection clause of the Fourteenth Amendment.'"  *Greene*, 2017 WL 1030707, at *30 (collecting cases).  Thus, the Court finds that these isolated and somewhat ambiguous transcript notations, which are not addressed or incorporated by Plaintiff elsewhere in the SAC (*see* Dkt. 11, at ECF 1–5, ECF 41–52), fail to support an Equal Protection claim.

5.    Staying Claims Against Officer Toto

Having liberally construed the SAC and determined that Plaintiff has sufficiently stated Section 1983 claims against Officer Toto based on an alleged unreasonable stop and frisk, false arrest, and unlawful search, the Court will now stay these claims until the resolution of the pending criminal case against Plaintiff, the outcome of which could affect the viability, scope, and/or resolution of one or more of Plaintiff's Section 1983 claims against Officer Toto. *See Wallace v. Kato*, 549 U.S. 384, 393–94 (2007) ("If a plaintiff files a false-arrest claim before he has been convicted (or files any other claim related to rulings that will likely be made in a pending or anticipated criminal trial), it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended"); *Stegemann v. Rensselaer Cnty. Sheriff's Off.*, 648 F. App'x 73, 78 (2d Cir. 2016) (summary order) ("Because [plaintiff]'s underlying criminal action is ongoing, the better course might be for the District Court to hold [plaintiff]'s civil action in abeyance until a judgment of conviction has been entered in his criminal case."); *Safran v. Singas*, No. 20-CV-4537 (PKC) (SMG), 2020 WL 7125232, at *5 (E.D.N.Y. Dec. 4, 2020) (staying false arrest claims pending the outcome of plaintiff's state court criminal proceedings).

The Court finds that a stay is particularly appropriate here, where it appears, based on the transcripts included with the SAC, that Plaintiff's defense counsel made arguments during a pre-trial hearing that are virtually identical to Plaintiff's claims challenging the legality of his stop and arrest.  (*See* Dkt. 13-2, at ECF 28–35; Dkt. 13-3, at ECF 10–24.)  At this time, the Court does not know how the state court judge decided these issues in the context of Plaintiff's criminal case, but is mindful that "[c]ourts in this Circuit have repeatedly barred § 1983 claims attempting to relitigate in federal court issues decided against them in prior criminal proceedings, whether held in federal or

state court."[22]  *See Almonte v. City of New York*, No. 15-CV-6843 (PAE), 2018 WL 3998026, at *3

(S.D.N.Y. Aug. 21, 2018).  The Court does not direct service of the SAC on Officer Toto, and

instead administratively closes this matter.  *Safran*, 2020 WL 7125232, at *6 (citing *Bussey v.*

*Devane*, No. 13-CV-3660 (JS) (WDW), 2013 WL 4459059, at *5 (E.D.N.Y. Aug. 16, 2013)).

Plaintiff may seek to reopen this matter once his criminal case has been fully resolved.  In that

event, however, Plaintiff will be limited to the claims in the SAC that the Court has found

sufficiently stated, as per this decision.  The only remaining Defendant, Officer Toto, will have

the opportunity to move for dismissal of Plaintiff's claims or other relief based on the outcome of,

and findings in, Plaintiff's criminal prosecution.

## C.     The DOC and New York City

The SAC appears to contain two claims aimed at the DOC and/or New York City—first, a

claim based on Plaintiff's alleged unconstitutional conditions of pre-trial confinement due to

COVID-19, and second, a claim based on Plaintiff's alleged denial of access to the courts.  For the

reasons explained below, both claims must be dismissed.

### 1.     Deliberate Indifference to Pre-Trial Conditions of Confinement

The Court permitted Plaintiff to amend his Amended Complaint to allege a Section 1983

claim based on deliberate indifference to the risk that he could contract COVID-19, provided that

he could identify whom the claim is against and the relief he is seeking.  (M&O, Dkt. 9, at 16.)  In

the SAC, as in the Amended Complaint, Plaintiff alleges very troubling conditions at Rikers Island

relating to the COVID-19 pandemic—overcrowding of units, housing of symptomatic and non-

---

[22] Further, as the Court noted in the M&O, if Plaintiff is ultimately convicted, and this civil case would call into question the validity of that conviction, then this case must be dismissed. (M&O, Dkt. 9, at 19 n.19 (citing, *inter alia*, *Wallace*, 549 U.S. at 394, which in turn cites *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)).

symptomatic detainees together, failing to enforce 6-foot social distancing, failing to provide adequate cleaning and protective supplies, and forcing staff to work even when unwell—all of which have created conditions in which the virus allegedly has spread and infected many detainees and staff members.  (*See* Dkt. 11, at ECF 1, 5, 10–12; Dkt. 13, at ECF 1–2; Dkt. 13-1, at ECF 4–5.)  Plaintiff also alleges that he contracted COVID-19 and remains significantly at risk due to his age and several health conditions.  (*See* Dkt. 11, at ECF 1, 5, 57; Dkt. 13 at ECF 1–2.)  However, despite these concerning allegations, Plaintiff fails to state a claim upon which relief may be granted because the relief he continues to seek is his immediate release from custody.

As the Court explained in the M&O, the remedy of release from confinement is not available under Section 1983.  (M&O, Dkt. 9, at 11–12 (citing, *inter alia*, *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)).)  Despite this explanation, and the Court's instruction to Plaintiff that he may amend his pleading, but "may not seek release from custody pursuant to Section 1983" (*id.* at 16), it is clear from the SAC that the only remedy Plaintiff seeks in connection with the allegedly unconstitutional conditions at Rikers Island is his immediate release from confinement (*see* Dkt. 11, at ECF 1 ("Th[e] virus at Rikers has infected over 1000 detainees & staff and is [accelerating] with new strains[,]. . . . [which] requires 'compassionate release' in this case for plaintiff Ronald Williams and 'Judicial Intervention.'"), ECF 5 ("Due to the pandemic and DOC putting Detainees like Plaintiff Williams at risk over 56 years old.  It could ultimately cause him death if he doesn't be released."), ECF 57 (arguing that based on his health conditions, "his continued [] pretrial detention [in] the COVID-19 pandemic is unlawful [and] [i]n violation of the [F]ourteenth Amendment"); Dkt. 11-1, at ECF 55 ("Plaintiff request compassionate release"); Dkt. 13, at ECF 2 ("Plaintiff prays that [in light of the alleged conditions] the Court order 'Compassionate Release'

to save my life and afford me the constitutional right to be [freed] due to this 'covid pandemic' and fight [my] case from the outside[.]")).

Therefore, because Plaintiff seeks release based on the allegedly unconstitutional conditions of confinement at Rikers Island, his claim is not cognizable under Section 1983 and is dismissed. *See Brown v. Moralles*, No. 14-CV-1382 (SJF) (GRB), 2014 WL 6610992, at *7 (E.D.N.Y. Nov. 18, 2014) ("Requests for release from custody must be brought under the narrow remedy available in federal habeas corpus, not through a damage action. Accordingly, plaintiff's Section 1983 claims seeking release from custody are dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) for failure to state a claim for relief." (internal citations omitted)). Furthermore, for the reasons already explained, Plaintiff's Section 2241 habeas claim—which is the proper vehicle to petition the Court for release—is also dismissed. In sum, the Court does not have the power to release Plaintiff from custody.[23]

### 2.   Denial of Access to the Courts

Plaintiff alleges that the "DOC" and "their superiors" denied him access to the courts by denying him access to the law library "to do research and use [] the typewriter to prepare pleadings," which directly resulted in an "adverse decision on divorce."[24] (Dkt. 11, at ECF 4; *see*

---

[23] The Court's statutory authority to review motions for compassionate release does not extend to Plaintiff, a state pre-trial detainee, because the Court did not (and will not) sentence Plaintiff in his criminal case. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Nor will the Court interfere with Plaintiff's bail status during the pendency of his criminal case absent allegations of bad faith, harassment, or irreparable injury, of which there are none. *See Jordan v. Bailey*, 570 F. App'x 42, 44 (2d Cir. 2014) (summary order) ("*Younger* abstention ordinarily applies to a state court's bail application proceedings." (citing *Wallace v. Kern*, 520 F.2d 400, 405–06 (2d Cir. 1975)); *Singleton v. NYC Dep't of Corr.*, No. 20-CV-9245 (LTS), 2021 WL 1987814, at *2 (S.D.N.Y. May 17, 2021) ("As this Court has no power to interfere with Plaintiff's bail proceedings, the Court dismisses this claim under the *Younger* doctrine.").

[24] It is not clear from the SAC whether this "decision on divorce" in fact involved Plaintiff. (Dkt. 11, at ECF 4.)

*also* Dkt. 11-1, at ECF 55.)  "While inmates have no 'abstract, freestanding right to a law library or legal assistance,' an inmate can state a claim for denial of access to the courts where he alleges that the 'shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim.'"  *Avent v. New York*, 157 F. App'x 375, 377 (2d Cir. 2005) (summary order) (quoting *Lewis v. Casey*, 518 U.S. 343, 351 (1996)).  The Court previously instructed Plaintiff that in order to state a claim for denial of access, he must "identify the specific harm to his criminal and/or civil cases that access to the law library would have prevented" and "identify the individual(s) who were personally involved in this alleged violation, and/or state a claim against the City of New York."  (*See* 1/11/2021 Docket Order.)  Plaintiff's amended claim does neither.

First, Plaintiff offers only a conclusory allegation about an "adverse decision on divorce," but does not specifically allege how purported restrictions on his access to the law library in fact hindered his efforts to pursue a legal claim, divorce or otherwise.  Second, as explained in the M&O, the "DOC" is not a suable entity, as suits against City agencies must be against New York City.  (M&O, Dkt. 9, at 16–17 (citing, *inter alia*, *Joseph v. NYC Dep't of Corr.*, No. 20-CV-1676 (PKC) (LB), 2020 WL 2128860, at *2 (E.D.N.Y. May 5, 2020)).)  However, Plaintiff fails to state a claim for municipal liability against New York City because he fails to allege that a municipal policy or custom caused the alleged denial of access to the law library at AMKC.  *See Joseph*, 2020 WL 2128860, at *2 (citing, *inter alia*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).  Further, Plaintiff does not allege the personal involvement of any "superiors" or other individuals in this alleged deprivation.  For these reasons, Plaintiff fails to state a claim for denial of access to the courts and this claim is dismissed.

## CONCLUSION

For the reasons stated above, (1) New York Attorney General Letitia James is dismissed; (2) Plaintiff's Section 2241 habeas claim is dismissed; and (3) Plaintiff's Section 1983 claims

alleging excessive force, an equal protection violation, deliberate indifference to pre-trial conditions of confinement, and denial of access to the courts are dismissed.  Plaintiff's Section 1983 claims against Officer Toto for unreasonable stop and frisk, false arrest, and unlawful search may proceed, but are stayed pending the resolution of the state criminal case against Plaintiff in Queens Supreme Court, *People v. Williams*, No. 30-2020.  The Court does not direct service of the SAC on Officer Toto at this time, and instead administratively closes this matter.  Plaintiff may seek to reopen this matter once his criminal case has been fully resolved.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of any appeal.  *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: June 9, 2021
      Brooklyn, New York